UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

UNITED STATES OF AMERICA,

                Plaintiff,

    - against -

RAYMOND RICARDO SIMPSON,

                Defendants.

-----------------------------------------------------------X

**MEMORANDUM AND ORDER**
10-CR-836 (RRM)(JO)

ROSLYNN R. MAUSKOPF, United States District Judge.

A bedrock principle of our nation's naturalization laws has been to accord U.S. citizenship upon the children of naturalized citizens. While the prerequisites and bases for so doing have shifted over time, our society and culture – as developed by, of course, the immigrants who make up the fabric of this nation – value keeping families united in the course of welcoming new people to the country. But as our laws are designed to accord citizenship to a child of a newly minted U.S. citizen, so too do our laws ensure that doing so does not come at the cost of depriving another parent of his rights in his child.

On November 3, 2010, defendant Raymond Ricardo Simpson ("Simpson") was indicted on one count of illegal reentry for being found in the United States without the consent of the Secretary of the Department of Homeland Security after having been deported from the United States, in violation of 8 U.S.C. §§ 1326(a), 1326(b)(2) and 18 U.S.C. §§ 1351 *et seq.* (Doc. No. 9.) On April 3, 2012, the government moved *in limine* to exclude evidence regarding Simpson's anticipated defense that he derived United States citizenship from his mother. (Doc. No. 38.) Simpson filed a memorandum in opposition to the motion (Doc. No. 40), to which the government responded, (Doc. No. 43). On July 24, 2012, the Court held the motion schedule in

abeyance pending a determination by the United States Citizenship and Immigration Service ("USCIS") on Simpson's claim to U.S. citizenship. After the USCIS determined that Simpson was not U.S. citizen, the parties resumed briefing on the motion. (Doc. Nos. 47, 49.) The Court held status conferences on October 11, 2012 and November 14, 2012, and requested that the parties provide English translations of Panamanian documents that the Court felt pertinent to the motion. The parties provided these translations. (*See* Doc. Nos. 50-51, 53.) The defense submitted additional briefing regarding the translated documents. (Doc. No. 52.) Upon consideration of the motion, the opposition thereto, and the record of the case, the Court concludes that the government's motion must be GRANTED.

## BACKGROUND

In anticipation of Simpson's expected defense at trial that he derived citizenship from his mother and therefore is not an alien subject to prosecution for illegal reentry, the government moved *in limine* to exclude the introduction of evidence and argument regarding his derivative citizenship. The government argues first, that whether Simpson has derived citizenship from his mother is a question of law that may be decided by the Court, and second, that, as a matter of law, Simpson has not derived citizenship from his mother. Separately, the government argues that Simpson should be precluded from presenting evidence regarding the positions of the USCIS' predecessor, the Immigration and Naturalization Service ("INS"), on whether Simpson is a U.S. citizen. Simpson argues the opposite on both issues, and contends that he should be permitted to present evidence regarding the INS' positions.

The relevant facts are undisputed, and laid out in greater detail in Judge Orenstein's Report and Recommendation on Simpson's motion to dismiss the indictment, from which the facts recited here are derived. (Doc. No. 30.) Simpson was born in Panama on July 5, 1959 to

Iceldia Joseph and Raymond Ricardo Simpson. Simpson was born out of wedlock, as, at the time of his birth, his mother was married to another man, George Taylor. Simpson's birth certificate indicates that Iceldia Joseph is his mother and Raymond Ricardo Simpson is his father. Simpson's father signed Simpson's birth certificate and declared his paternity before an auxiliary record of the Civil Registry soon after Simpson's birth.

Simpson entered the United States as a legal permanent resident on August 4, 1967. Simpson's mother became a naturalized U.S. citizen on February 26, 1974. At that time, Simpson lived with his mother in the United States and was fourteen years old.

From 1982 onward, Simpson amassed a criminal record, which prompted a number of interactions with INS officials and investigations into his immigration status. In 1988, Simpson was in the custody of the INS. Simpson claimed to INS officials that he derived citizenship through his mother; the next day, INS officials told him they made a mistake and released him. Then, in 1991, Simpson was imprisoned. He applied to a prison program, and was told he was ineligible because of an immigration detainer. Simpson told prison officials that the detainer was a mistake. An INS official sent a letter to the prison stating that the INS concluded that Simpson was a derivative United States citizen and not subject to deportation proceedings. Then, in 1994, Simpson spoke with individuals that he believed were from INS about his immigration status. The INS took no action against Simpson at that time.

Simpson was paroled in 2003. In 2005, the INS issued a warrant for Simpson's arrest and a notice to appear, asserting that Simpson was deportable because of his convictions for aggravated felonies. Simpson claimed that he was not subject to deportation because he derived citizen from his mother. The immigration judge ruled that Simpson was not a derivative citizen, and in 2006, Simpson was deported and removed from the United States.

On August 24, 2010, the New York City Police Department arrested Simpson in Brooklyn on drug possession charges. Based on that arrest, the federal government secured a warrant to arrest Simpson for illegally reentering the United States. Simpson was indicted by a grand jury on the illegal reentry charge on November 3, 2010. Simpson moved to dismiss the indictment, which the Court denied in adopting the Report & Recommendation on February 27, 2012. (Doc. No. 33.) The government then filed this motion *in limine*.

## DISCUSSION

### I. Derivative Citizenship

#### A. Statutory Framework

To determine whether Simpson derived citizenship from his mother, the Court applies "the law in effect when [he] fulfilled the last requirement for derivative citizenship." *Ashton v. Gonzales*, 431 F.3d 95, 97 (2d Cir. 2005) (citing *Rodriguez-Tejedor*, 23 I. & N. Dec. 153, 163 (BIA 2001)). The parties agree that the relevant citizenship law in effect when he fulfilled the last requirement, that is, when his mother naturalized in 1974, was section 321(a) of the Immigration and Nationality Act ("INA"), as codified in former 8 U.S.C. § 1432(a).[1] Section 1432(a) provides as follows:

> A child born outside of the United States of alien parents, or of an alien parent and a citizen parent who has subsequently lost citizenship of the United States, becomes a citizen of the United States upon fulfillment of the following conditions:
> (1) The naturalization of both parents; or
> (2) The naturalization of the surviving parent if one of the parents is deceased; or
> (3) The naturalization of the parent having legal custody of the child when there has been a legal separation of the parents or the naturalization of the mother if the child was born out of wedlock and

---

[1] Section 1432(a) of Title 8 was repealed by the Child Citizenship Act of 2000, Pub. L. No. 106-395, § 103, 114 Stat. 1631, 1632.

4

the paternity of the child has not been established by legitimation; and if

(4) Such naturalization takes place while such child is under the age of sixteen years; and

(5) Such child is residing in the United States pursuant to a lawful admission for permanent residence at the time of the naturalization of the parent last naturalized under clause (1) of this subsection, or the parent naturalized under clause (2) or (3) of this subsection, or thereafter begins to reside permanently in the United States while under the age of sixteen years.

Thus, there are a four general circumstances in which a child can derive citizenship from his parent or parents: (1) if both of his parents naturalize; (2) if one parent naturalizes while the other is deceased; (3) if one parent, having legal custody of the child after a legal divorce or separation of the parents, naturalizes; and (4) if the child is born out of wedlock and his mother naturalizes. The fourth scenario is what is potentially presented here, and is discussed in more detail below.

Particularly relevant to this motion is Congress's purpose in enacting § 1432(a). The legislative history underlying § 1432(a) is "sparse." *Nehme v. I.N.S.*, 252 F.3d 415, 424 (5th Cir. 2001). Courts considering the statute's purpose and intent, however, have concluded that "Congress wanted to ensure that only those alien children whose 'real interests' were located in America with their custodial parent, and not abroad, should be automatically naturalized." *Id*. at 425. Moreover, in adopting the provision, Congress sought to "promote marital and family harmony and . . . prevent the child from being separated from an alien parent who has a legal right to custody." *Bustamante-Barrera v. Gonzales*, 447 F.3d 388, 397-98 (5th Cir. 2006) (quoting *Nehme*, 252 F.3d at 425). In short, Congress's goal in enacting § 1432(a) was "the protection of parental rights." *Gosira v. Loy*, 357 F. Supp. 2d 453, 462 (D. Conn. 2005) (citing *Barthelemy v. Ashcroft*, 329 F.2d 1062, 1066 (9th Cir. 2003)). The statute prevents a naturalizing parent from divesting the absent alien parent from his or her rights in the child.

*Gosira*, 357 F. Supp. 2d at 462 (citations omitted). In other words, "if United States citizenship were conferred to a child where one parent naturalized, but the other parent remained an alien, the alien's parental rights could be effectively extinguished." *Barthelemy*, 329 F.3d at 1066 (citing *Fierro v. Reno*, 217 F.3d 1, 6 (1st Cir. 2000) and *Wedderburn v. I.N.S.*, 215 F.3d 795, 800 (7th Cir. 2000)); *see also Brandao v. Attorney General*, 654 F.3d 427, 429-30 (3d Cir. 2011) (explaining that § 1432(a)(3) is "consistent with the important governmental objective of allowing single parent derivative citizenship while protecting the rights of alien parents by limiting circumstances in which it (derivative citizenship) can occur").

Congress also recognized that in some circumstances, protecting the rights of both parents is unnecessary or unwarranted. *See Gosira*, 357 F. Supp. 2d at 462 ("The exceptions . . . reflect Congress' recognition of circumstances in which this general rule precluding derivative citizenship when only one parent naturalizes is overly broad."). Thus, it carved out some exceptions to the basic rule that both parents must naturalize in order for their child to derive citizenship in subsections (2) and (3) of the statute. In these exceptions, "the alien parent's rights are not of concern," such as when the alien parent is deceased, the parents are legally divorced or separated, or if the father is the alien and has not legitimated the child. *Id.*; *see also Lewis v. Gonzales*, 481 F.3d 125, 131 (2d Cir. 2007) (noting that with few exceptions, § 1432(a) "recognizes that either parent—naturalized or alien—may have reasons to oppose the naturalization of their child, and it respects each parent's rights in this regard").

Only subsections (3)-(5) of § 1432(a) apply to Simpson. As such, to derive citizenship, Simpson must meet five requirements. First, Simpson had to have been born outside of the United States. Second, he had to have been born out of wedlock. Third, Simpson's "paternity" cannot have been "established by legitimation." Fourth, at the time of his mother's

naturalization, Simpson had to have been under the age of sixteen years. And fifth, at the time of his mother's naturalization, Simpson had to have been residing in the United States pursuant to a lawful admission for permanent residence.

Simpson and the government agree that Simpson was born in Panama and out of wedlock (satisfying requirements one and two) and that, at the time of his mother's naturalization, Simpson was under the age of sixteen and residing in the United States pursuant to a lawful admission for permanent residence (satisfying requirements four and five). Only the third requirement – whether Simpson's "paternity . . . has not been established by legitimation" – is contested here. § 1432(a)(3).

Before addressing the central issue of whether Simpson's paternity has been established by legitimation, the Court considers two preliminary issues that Simpson raises in his opposition papers. First, Simpson urges that the INA's definition of a "child," found in § 1101 of the INA in force at the relevant time, adds on yet another requirement relevant to his derivative citizenship claim. As discussed below, the Court concludes that it does not. Second, Simpson argues that whether his paternity has been established by legitimation is a fact question for the jury. The Court disagrees, and finds that this question can, and must, be decided as a matter of law by a judge. The Court addresses each argument in turn.

1. "Child" in the INA

At the time of his mother's naturalization, § 1101(c)(1) of the INA defined "child" as follows:

> (c) As used in subchapter III of this chapter—
> (1) The term "child" means an unmarried person under twenty-one years of age and includes a child legitimated under the law of the child's residence or domicile, or under the law of the father's residence or domicile, whether in the United States or elsewhere, and, except as otherwise provided in sections 1431 to 144 of this title, a child adopted

> in the United States, if such legitimation or adoption takes place before
> the child reaches the age of sixteen years, and the child is in the legal
> custody of the legitimating or adopting parent or parents at the time of
> such legitimation or adoption.

According to Simpson, in order to be a child whose "paternity has not been established by legitimation" within the meaning of § 1432(a), the child must also be "in the legal custody of the legitimating . . . parent or parents at the time of such legitimation or adoption." § 1101(c)(1). The record is silent as to whether Simpson was in his father's legal custody at the time his father signed the birth certificate; as such, Simpson contends that his paternity was not established by legitimation within the meaning of § 1432(a)(3).

Simpson's argument highlights an apparent conflict between the more specific terms of § 1432(a)(3) and the more general definition of a child in § 1101(c)(1). The Second Circuit addressed a similar inconsistency between § 1432(a) and § 1101(c)(1) in *Langhorne v. Ashcroft*, 377 F.3d 175 (2d Cir. 2004). There, an alien claimed derivative citizenship pursuant to § 1432(a)(3) in a removal proceeding. At the time of his father's naturalization, the petitioner was fifteen years old. His parents divorced when he was nineteen. *Id*. at 178. The petitioner argued that he was still a "child" within the meaning of § 1432(a)(3) because he was under the age of twenty-one, as provided by the INA's general definition of a child, even though § 1432(a)(4) provides that, in the case of deriving citizenship from separated or divorced parents, the child must be under the age of eighteen. *Id*.[2] The Second Circuit rejected the petitioner's argument. In the court's view, § 1432(a) clearly stated that, in order to derive citizenship from one parent in the case of divorce, the naturalization of the parent must occur after the parents are divorced *and* while the child is under the age of eighteen. Therefore, "the general definition of 'child' [in the

---

[2] At issue in *Langhorne* was a later version of § 1432(a), which contained an eighteen-year age requirement, rather than the sixteen-year requirement that was in effect at the time relevant for purposes of this motion.

INA] cannot trump this plain reading of" § 1432(a). *Id*. at 180. In so holding, the court emphasized that "'in fulfilling our responsibility in interpreting legislation, we are not guided by a single sentence or member of the sentence but (rather) look to the provisions of the whole law, and to its object and policy.'" *Id*. (quoting *Richards v. United States*, 369 U.S. 1, 11 (1962)).

The same reasoning applies here. The plain language of § 1432(a)(3) makes clear that no custody requirement applies because it sets forth explicitly the requirements for deriving citizenship. No custody requirement is enumerated. As the Second Circuit has instructed, "the general definition of 'child' [in the INA] cannot trump" a plain reading of § 1432(a)(3). *Langhorne*, 377 F.3d at 180; *see also Anderson v. Holder*, 673 F.3d 1089, 1097 n.8 (finding that the general definition of child in § 1101(c) did not trump the more specific requirements of § 1409(a)). Equally important, § 1432(a)(3) would make no sense if it contained a custody requirement. In order for a child in Simpson's shoes to derive citizenship, he must be (1) born outside of the United States, (2) born out of wedlock, (3) not legitimated by his birth father, (4) under the age of sixteen years at the time of his mother's naturalization, and (5) residing in the United States as a legal permanent resident at the time of his mother's naturalization. It would be make little sense to require the child to have been in the custody of the legitimating parent – here, the birth father – when § 1432(a)(3) expressly requires the child *not* to have been legitimated by his birth father if he is to derive citizenship from his mother. Indeed, importing the custody requirement would wholly undermine the purpose underlying the derivative citizenship statute: single parent derivative citizenship only where the absent alien parent has no rights vis-à-vis the child. The Court thus rejects Simpson's argument that the definition of child in § 1101(c)(1) imports the notion of parental custody into the derivative citizenship analysis.

### 2. Judge or Jury Determination

Before the Court turns to whether Simpson's paternity has not been established by legitimation, it must also address preliminarily whether Simpson's claim to derivative citizenship is within the Court's purview and power to decide. The government argues that whether Simpson has derived citizenship from his mother is an issue of law that must be decided by the Court. In contrast, Simpson contends in his papers that the issue is a factual question for the jury to determine. However, at a status conference before the Court, Simpson's counsel narrowed her view of whether Simpson's claim to derivative citizenship is an issue for the Court to decide. Defense counsel stated that only if the Court agreed that there was a sixth requirement that the child be in the custody of the legitimating parent would the issue of derivative citizenship have to go to a jury. That is because the record was silent as to whether Simpson was in his father's custody at the time of his alleged legitimation. Thus, she suggested, the parties would put forth evidence regarding custody, and the jury would determine this fact issue. If the Court found that there was no custody requirement, defense counsel stated that the trial would essentially be one on stipulated facts.

Because the Court has concluded that there is no sixth requirement concerning custody under § 1432(a), the Court finds that it can determine as a matter of law whether Simpson has met the requirements of § 1432(a). Whether Simpson derived citizenship automatically, that is, by operation of law, from his mother is a legal determination that depends here upon under what circumstances, pursuant to Panamanian law, the paternity of a child is "established by legitimation." What § 1432(a)(3) means by "established by legitimation," and what constitutes such action under Panamanian law, requires interpreting statutes, a task appropriately left to the court, the "'final author[ity] on issues of statutory construction.'" *United States v. Nolan*, 136

F.3d 265, 271 (2d Cir. 1998) (quoting *Federal Election Comm'n v. Democratic Senatorial Campaign Cmte.*, 434 U.S. 27, 32 (1981)) (brackets in original).

It is thus not surprising that, with respect to the very statute being interpreted here, the Second Circuit has noted that whether paternity is "established by legitimation" is a "legal conclusion" the court "reviews de novo" on appeal. *Blake v. Keisler*, 249 Fed. Appx. 838, 839 (2d Cir. 2007) (summary order). Similarly, the Third Circuit reviews a derivative citizenship claim de novo because "it presents a pure question of statutory interpretation." *Jordon v. Attorney General*, 424 F.3d 320, 328 (3d Cir. 2005); *see also United States v. Livingston*, 404 Fed. Appx. 685, 689 (3d Cir. 2010) (unpublished) (same). The Ninth Circuit agrees. In a case involving a derivative citizenship claim, it held that, when the "controlling issue is the meaning of statutory terms," whether the defendant has derived citizenship is a matter of law for the judge, not the jury, to decide. *United States v. Castro-Cabrera*, 452 Fed. Appx. 789, 792 (9th Cir. 2011) (unpublished).

In Simpson's case, there are no factual disputes related to the question of derivative citizenship. Simpson and the government agree upon the facts of this case, as outlined above. Where they disagree is with respect to a question of law, *i.e.*, under what circumstances a child's paternity is "established by legitimation." It is not for a jury to answer that question because it turns on an interpretation of law, not on a factual question.

B. "The paternity of the child has not been established by legitimation"

The Court now turns to its primary task – determining whether Simpson's "paternity . . . has not been established by legitimation." It begins with that very phrase, one whose meaning is not readily apparent. The INA does not define or offer any further guidance on the meaning of

this phrase. As such, the Board of Immigration Appeals ("BIA"), as the agency in charge of administering the INA, has supplied the statute's meaning.

But first, it is important to point out that the clause implicates two concepts: paternity and legitimation. More specifically, the clause ties the two concepts together, with paternity being "established by legitimation." This made sense to the Congress enacting this law, as at the time, the laws were such that '[a]s a general proposition, legitimation is accomplished by the marriage of the parents with acknowledgement of the paternity by the putative father.'" *Anderson*, 673 F.3d at 1092 (quoting S. Rep. No. 81-1515, at 692-93 (1950)). As laws governing the legitimacy and legitimation of children have evolved, however, an "act" legitimating the child – such as acknowledging paternity or the marriage of the parents – is not necessarily required. Instead, jurisdictions could "confer legitimacy without the need for formal action." *Anderson*, 673 F.3d at 1099. Thus, in *Anderson*, the Ninth Circuit concluded that the petitioner was "legitimate" because, although his father never signed his birth certificate, the law of the relevant jurisdiction made all children legitimate for purposes of a similar derivative citizenship statute. *Id.* at 1101; *see also Lau v. Kiley*, 563 F.2d 543, 551 (2d Cir. 1977) ("Because we conclude that Chinese law makes all children 'legitimate,' we need not consider the secondary question of whether there is a procedure in China for 'legitimating' a child.").

Whether the "legitimation" laws of the jurisdiction which is relevant in this motion, Panama, requires an "act" to legitimize Simpson or whether he was simply "legitimate" by law, need not detain the Court. That is because even if some formal act were required, the parties agree that it was satisfied. Simpson's birth father signed Simpson's birth certificate and declared

his paternity before an auxiliary record of Panama's Civil Registry soon after Simpson's birth.[3] The question is thus whether Simpson was a "legitimate" child under Panamanian law.

The BIA has interpreted the concept of legitimation as it is presented throughout the INA – in derivative citizenship statutes and visa petition statutes – as turning on whether a child born out of wedlock is afforded all of the same legal rights and obligations under the law of his country of origin as a child born in wedlock. In *In re Moraga*, 23 I. & N. Dec. 195, 197 (BIA 2001), the BIA explained, "we have defined legitimation as the act of placing a child born out of wedlock in the same legal position as a child born in wedlock." In *In re Rowe*, 23 I. & N. Dec. 962, 965-66 (BIA 2006), the BIA stated, "where we have found that all legal distinctions between children born in and out of wedlock have been eliminated and that all children are accorded equal treatment under the laws, a child is deemed legitimate or legitimated for all purposes." And in *Matter of Hernandez*, 19 I. & N. Dec. 14, 16 (BIA1983), the BIA stated, "When the country where [the alien] was born and resides eliminates all legal distinctions between legitimate and illegitimate children, all natural children are deemed to be the legitimate or legitimated offspring of their natural father from the time that country's laws are changed."

Federal courts examining the concept of legitimation under the INA have consistently adopted this view. *See Anderson*, 673 F.3d at 1099 ("In multiple cases, federal courts of appeals and the BIA have held that statutes abolishing the distinction between legitimate and illegitimate children suffice to meet the requirement of 'legitimation.'" (discussing cases)); *Brandao v. Attorney General*, 654 F.3d at 430 (applying the rule announced in *Matter of Hernandez* when

---

[3] Indeed, it seems that the parties agree that the acknowledgement of paternity before the Civil Registry was required under Panamanian law if Simpson's paternity were to be established by legitimation under § 1432(a)(3). Neither has provided the Court with evidence of Panamanian law confirming or denying this assumption. No matter the status of Panamanian law, the outcome is the same: either an act was required and that act was satisfied, as the parties agree, or, no act was required.

determining whether an alien is legitimated within the meaning of § 1432(a)(3)); *De Los Santos v. I.N.S.*, 690 F.2d 56, 59 (2d Cir. 1982) ("[T]he INS's interpretation of 'legitimated' as requiring the acquisition of rights coextensive with those of a legitimate child is consistent with the language of the Act."); *Lau*, 563 F.2d at 550-51 (examining whether foreign law eliminated distinctions between children born in and out of wedlock in order to determine whether the alien child seeking a visa preference was "legitimate" under 8 U.S.C. § 1101(b)(1)(A)); *Gorsira*, 357 F. Supp. 2d at 460-63 (examining whether foreign law eliminated distinctions between children born in and out of wedlock in order to determine whether paternity had been established by legitimation under § 1432(a)(3)).

The government and Simpson agree that the Court owes *Chevron* deference to the BIA's view that the paternity of a child has been established by legitimation when the country in which the child was born has eliminated all legal distinctions between children born in and out of wedlock. *See generally Chevron U.S.A., Inc. v. Nat'l Res. Def. Council*, 467 U.S. 837 (1984). And as a general matter, the Court would apply *Chevron* deference to the BIA's interpretation of § 1432(a). *See Langhorne*, 377 F.3d at 178 (noting that the *Chevron* framework applies when interpreting § 1432(a)). But as recently as 2011, the Second Circuit expressed concerns about the BIA's interpretation of legitimation, specifically as that concept is used in § 1101(c)(1) of the INA.

In *Watson v. Holder*, 643 F.3d 367, 370 (2d Cir. 2011), the Second Circuit remanded an immigration case to the BIA in order for the agency to "(1) clarify precisely how it interprets the concept of 'legitimation' as it is used in § 1101(c)(1), and (2) justify how it arrived at that particular interpretation." It did so because it discerned a shift in the BIA's approach to legitimation. The court explained, "For many years the BIA appears to have been of the view

that the concept of legitimacy turned on the substantive legal rights conferred by applicable law rather than on mere labels codified by statute." *Id*. at 369. As an example of this view, the court pointed to *Matter of Clahar*, 18 I. & N. Dec. 1, 2 (BIA 1981), where, examining the law of Jamaica, the BIA held that the Status of Children Act of 1976 abolished the distinctions in rights and status of children born in and out of wedlock. The Second Circuit noted that, in *Clahar*, the BIA found particularly important the view of the Jamaican Minister of Justice that "'the legal duties and obligations of a father towards a child born out of wedlock are in all significant respects the same as those of a child born in wedlock.'" *Watson*, 643 F.3d at 369 (quoting *Clahar*, 18 I. & N. Dec. at 5). The Second Circuit then explained that the BIA overruled *Clahar* in *Matter of Hines*, 24 I. & N. Dec. 544 (BIA 2008). In *Hines*, the BIA held that, although Jamaica's Status of Children Act eliminated all legal distinctions between "legitimate" and "illegitimate" children, the Jamaican Legitimation Act "continues to provide that a child born out of wedlock can be 'legitimated' only by the subsequent marriage of his or her parents." 24 I. & N. Dec. at 548. Therefore, Jamaica had not in fact eliminated all legal distinctions between children born in and out of wedlock.

In comparing these two cases, the Second Circuit in *Watson* noted that "an agency does not forfeit *Chevron* deference merely because it has reconsidered a previous legal interpretation." 643 F.3d at 369. And this Court applies such deference here. But it highlighted two concerns it felt that the BIA should address. The first was the BIA's precise definition of legitimation: "For instance, does the BIA recognize a difference between legitimate and illegitimate that is purely formalistic—in other words, where the law in question retains the label of 'legitimate' for children born to married parents, but ensures that 'illegitimate' children are treated exactly the same as their legitimate counterparts—or is some substantive discrimination in the law

necessary?"  *Id*. at 370.  Second, the court was "unclear as to the legal and/or logical basis for the BIA's interpretation."  *Id*.[4]

Most importantly, the Second Circuit in *Watson* took care to highlight its view of the concept of legitimation in the INA, as it explained in the pre-*Chevron* case *Lau v. Kiley*.  *See Watson*, 643 F.3d at 370 n.1 (discussing *Lau*, 563 F.2d at 548).  In *Lau*, the Second Circuit considered whether a child born to unmarried parents in China was a legitimate child under Chinese law for purposes of determining whether the petitioner qualified for a visa preference for his son, who was born out of wedlock.  562 F.2d at 544.  The son's legitimacy mattered because the provisions of the INA governing visa preferences required the son to be a "legitimate" or "legitimated" child.  *Id*. at 545 (discussing 8 U.S.C. § 1101(b)(1)).  A relevant Chinese statute provided, "Children born out of wedlock shall enjoy the same rights as children born in lawful wedlock.  No person shall be allowed to harm them or discriminate against them."  *Id*. at 545.  The question was whether this statute made the son legitimate, or legitimated him, under Chinese law.

In holding that the statute did, the court in *Lau* started with first principles:  "Legitimacy is a legal concept.  The law makes a child legitimate or illegitimate."  *Id*. at 548.  In other words, any distinction between children born in and out of wedlock must exist in the law, and "the distinction must have some effect and must have been designed to distinguish between the two categories in order that they have different rights or obligations."  *Id*.  A child would not be considered illegitimate in the eyes of the law if, for example, societal or religious norms considered him to be illegitimate because he was born out of wedlock.  So too would a child not

---

[4] The BIA issued an opinion on remand in Watson's case, dismissed the case, and terminated the proceedings.  *See In re: Watson*, BIA No. A046 633 823 (BIA Jan. 24, 2013).  The BIA did not address the questions the Second Circuit posed, however, noting that it would do so in a forthcoming supplemental decision.

be considered illegitimate if, for example, he was discriminated against because he was born out of wedlock when the law clearly regards him as legitimate. "Whether a child is born in wedlock or out of wedlock may be sociologically, religiously, or psychologically significant, but there is no legal significance *unless the law makes one*." *Id.* (emphasis added). In other words, legitimacy is a "legal condition" that either exists or does not. *Id.* at 549.

Reading *Watson* and *Lau* together, it is clear that legitimacy – as that concept is used in the INA – is a legal construct. Thus, where a provision of law grants all children, whether born in or out of wedlock, the same legal rights and obligations under the law, those children are all considered legitimate for purposes of the INA. As the BIA has held, Simpson's paternity would be established by legitimation when the law places him "in the same legal position as a child born in wedlock," *In re Moraga*, 23 I. & N. Dec. at 197 and when he is accorded "equal treatment under the laws," *In re Rowe*, 23 I. & N. Dec. at 965-66. In other words, the BIA too seems to view legitimacy as a "legal condition." Thus, as the parties agree, and as underscored by both Second Circuit and BIA precedent, whether Simpson's paternity has been established by legitimation turns on whether Panamanian law maintains any distinctions between children born in and out of wedlock in their legal rights or obligations. In other words, would Simpson have been considered a legitimate child – possessing the same legal rights and obligations – under Panamanian law as it existed when his mother naturalized? It is to this question the Court now turns.

C.  Panamanian Law

The task of construing foreign law is both rare and challenging, as it requires the Court to step outside the legal framework to which it is accustomed. First principles – the basic rules upon which a system of laws are built – are not the same the world around. Mindful of the

17

potential for differences between the very basics of the Panamanian and United States' legal systems, the Court has undertaken this task with great care, and with the greatest respect for Panama and its law.

The parties dispute whether there existed in Panamanian law distinctions between children born in and out of wedlock at the time of Simpson's mother's naturalization. Both have marshaled substantial amounts of Panamanian law and legal opinions in support of their arguments.[5]

According to the government, Panama's 1946 Constitution, the country's highest legal authority, eliminated all legal distinctions between children born in wedlock and out of wedlock by declaring the equality of children under the law. Simpson's argument is more nuanced. He acknowledges the supremacy of the 1946 Constitution and its declaration that all children are equal before the law. But according to Simpson, provisions of the Civil Code of Panama – enacted in 1916 and in effect in 1974 – maintained distinctions between children born in and out of wedlock, and were not repealed by the Panamanian legislature until 1995. In the interim, some provisions were declared unconstitutional by the Panamanian Supreme Court, while others were not. As such, Simpson argues, Panamanian law did not fully abolish all distinctions between children born in and out of wedlock.

While Simpson correctly notes that some statutes that distinguished between children born in and out of wedlock after Panama adopted the 1946 Constitution remained "on the

_____

[5] The Court considers the Panamanian law as submitted by the parties. *See* Fed. R. Crim. P. 26.1 ("A party intending to raise an issue of foreign law must provide the court and all parties with reasonable written notice. Issues of foreign law are questions of law, but in deciding such issues a court may consider any relevant material or source—including testimony—without regard to the Federal Rules of Evidence."). In addition, there is no dispute as to the English translations of Panamanian law and the legal opinions of foreign lawyers, and the Court accepts those translations and opinions as submitted.

books," neither Simpson nor his experts has opined or demonstrated that these vestiges of an earlier – and fundamentally different regime regulating the rights of Panamanian children – had or could have had any legal effect on the rights of children born in or out of wedlock. Indeed, the Court concludes that the Constitution's supremacy and its unequivocal elimination of distinctions controls. As such, the Court finds that Simpson was a legitimate child under Panamanian law.

1. The Equality of Children after 1946

The 1946 Constitution provides, in pertinent part:

> **Article 58**: Parents have the same duties with respect to their children born out of wedlock as toward their children born in wedlock. All children are equal before the law and they have the same rights of inheritance in intestate succession.

> **Article 59**: Investigation of paternity shall be regulated by law. Any classification based on the nature of the relationship is abolished. No statement establishing differences of birth or of the civil status of parents shall be entered in registration records, or in any attestation, baptismal record, or certificate referring to the relationship.

> Authority is granted to the father of a child born before the effective date of this Constitution to protect him by the provisions of this article, by means of the rectification of any record or attestation in which any classification has been established with respect to said child. For this purpose the consent of the mother is not required. If the child is of adult age he should give his consent thereto.

> * * *

> **Article 253**: All laws contrary to this Constitution are hereby repealed. All laws, legislative decrees, decrees, regulations, orders, and other provisions in force at the time this Constitution is promulgated shall continue in effect insofar as they are not contrary to the Constitution or to laws hereinafter enacted.

(Exs. 2-3 to Govt.'s Dec. 5, 2012 Ltr. (Doc. Nos. 53-2 & 53-3) at 9, 52.)

Reading it plainly, the Constitution unequivocally declares that all legal distinctions between Panamanian children born in and out of wedlock were eliminated. The effect of such declaration is that all Panamanian children would be considered "legitimated" under § 1432(a). *See Lau*, 563 F.2d at 548 (holding that a Chinese law declaring that "children born out of wedlock shall enjoy the same rights as children born in lawful wedlock" makes all children born in China legitimate). Not only does Article 58 declare that "all children are equal before the law," it proclaims that all parents have the same duties to their children whether born in or out of wedlock. Article 59 further strengthens Article 58's declaration of equality by abolishing all labels and classifications based on the marital relationship of the child's birth parents and providing a mechanism through which such classifications can be retroactively modified to conform with these newly adopted provisions. As one Panamanian constitutional scholar writing in 1967 noted, "Few legislations offer a system with this large coverage for the equality of children like the one established by our [1946] Constitution.[6] (Ex. D to Def.'s Nov. 21, 2012 Ltr. (Doc. No. 50-4) at 279.)

---

[6] This same scholar, Cesar Quintero, provides context for the evolution of Panamanian law as it pertains to the equality of children born in and out of wedlock. He notes that Panamanian law has evolved through three different "systems" governing the status of children. The first regime did not recognize children born outside of marriage, classified them based on the relationship between the biological mother and father (for example, whether the child was born of two parents who could have been married, or were born of an adulterous or incestuous relationship), prohibited them from inheriting from their parents, and, except in rare cases, barred them from questioning paternity or requesting child support. (*Id*. at 277.) The second system recognized rights in children conceived outside the marriage, but maintained clear distinctions between the rights accorded to them and to children born to parents in a valid marriage. (*Id*. at 277-78.) The third – instituted by the 1946 Constitution – is "one that does not allow distinctions between the children based on the nature of the union of their parents." (*Id*. at 278.)

The BIA agrees. It has held that the 1946 Constitution abolishes all distinctions for purposes of § 1432(a)(3), and the Court finds its reasoning persuasive.[7] In *Matter of Sinclair*, 13 I. & N. Dec. 613, 614 (BIA 1970), the agency held that "Article 58 abolished the old distinctions between legitimacy and illegitimacy" such that the child was considered to be a legitimate child of the petitioner seeking a visa for his son. In *Matter of Maloney*, 16 I. & N. Dec. 650 (BIA 1978), the BIA reached the same conclusion. It noted that "Article 58 granted all children equal rights before the law and abolished classification based upon the nature of the father-child relationship. 'Classification' referred to the categories legitimate, natural, or illegitimate which had existed under prior laws." *Id*. at 651. As such, the BIA held that "under the 1946 Constitution, all acknowledged children are to be treated equally in the eyes of the law as legitimate children. It is clear that an acknowledgement of paternity, with or without marriage, will lead to legitimation." *Id*. at 651-52.

Furthermore, in 1950, the Attorney General of Panama also agreed that the equality provisions of the 1946 Constitution made all children equal before the law. The United States sought Panama's legal advice when considering a similar derivative citizenship case. The Attorney General advised that Article 58 of the Constitution "clearly prescribes the equality of all children under the law." (Ex 1. to Def.'s Nov. 21, 2012 Ltr. (Doc. No. 51-1) at 6.) The Attorney General further opined that there was "no reason for" classifying children as legitimate or illegitimate, as the Civil Code did, in light of Articles 58 and 59 of the Constitution. (*Id*.) In other words, the fact that the Civil Code still maintained distinctions between children born in and out of wedlock did not control; the Constitution did.

_____

[7] The Court does not defer to the BIA's interpretations of Panamanian law, as it is not charged with administering these laws. *Cf. Mugali v. Ashcroft*, 258 F.3d 52, 55 (2d Cir. 2001) (noting that a court of appeals reviews the BIA's interpretation of state or federal criminal laws because the BIA is not charged with administering those laws).

Memoranda from the Law Library of Congress, submitted by the government, also support the Court's conclusion here that the 1946 Constitution abolished legal distinctions between children born in and out of wedlock for purposes of § 1432(a)(3). A March 2012 memorandum prepared by Senior Foreign Law Specialist Gustavo Guerra noted that Article 58 provided for equality of children. (Ex. 5 to Govt.'s Mot. *in Limine* (Doc. 38-5) at 1.) A 1992 memorandum from Legal Specialist Norma C. Gutierrez reached the same conclusions and stated them more forcefully. She stated, "The 1946 Constitution abolished provisions of the Civil Code of 1916, which governed legitimation and stated that only natural children could be legitimated." (Ex. 1 to Govt.'s Dec. 5, 2012 Ltr (Doc. No. 53-1).) She concluded, "[T]he concepts of legitimate and illegitimate children were abolished from the Panamanian legal system since the enactment of the Constitution of 1946. The law makes no distinction whatsoever on the matter of rights of the children whatever their parentage. The only necessary distinction is found in the form of establishing parentage." [8] *Id.*

In sum, the plain language of the 1946 Constitution, together with persuasive opinions from the BIA, the Attorney General of Panama, and the Law Library of Congress, shows that Panama eliminated all distinctions between children born in and out of wedlock and granted children born in and out of wedlock equal rights and obligations under the law. The effect of such is that Simpson would have been considered legitimate under Panamanian law for purposes of § 1432(a)(3).

### 2. The Effect of Remaining Civil Code Provisions

Notwithstanding the weight and clarity of these sources, Simpson points to provisions of the Civil Code, as it stood in 1974, suggesting that classifications among children based on their

---

[8] As discussed above, the parties agree that Simpson's father properly established paternity – or parentage – pursuant to Panamanian law.

birth remained the law in Panama. For example, Article 224 of the Civil Code defined "natural children" as "those conceived outside of marriage, to parents that at the time of conception could have been legally married." (Ex. C to Def.'s Supp. Memo. in Opp'n (Doc. 43-3) at 45.) According to Article 219, a natural child had the right to take the surname of the parent who acknowledged him or her, was entitled to a sustenance allowance, and could inherit. (*Id*. at 44.) In contrast, Article 226 defined "illegitimate children" as those upon whom "the legal status or state of natural children cannot be applied." (*Id*. at 46.) In other words, illegitimate children are those who were born out of wedlock and whose parents could not have been married. [9] Illegitimate children, according to Article 226, "are entitled only to demand a sustenance allowance from their parents." (*Id*.)

Simpson maintains that these, and other, provisions of the Civil Code remained in force and effect as they were not declared unconstitutional and were only explicitly repealed in 1995, when a new family code was enacted. He maintains this argument notwithstanding the Article 253 of the Constitution – set forth above – that provides for the repeal of all laws contrary to the Constitution. He also relies on Article 167 of the 1946 Constitution, which vests in the Supreme Court the ultimate power to declare laws unconstitutional:

> **Article 167**: Together with its other constitutional and legal powers, the Supreme Court of Justice shall have the following:
>
> 1) Guardianship of the integrity of the Constitution, to which end it shall decide . . . on the enforceability of bills that have been vetoed by the Executive as unconstitutional . . . and on the constitutionality of laws, decrees, orders and other acts challenged before it by any citizen on such grounds . . . .

---

[9] Simpson states, and the Government does not challenge, that he was an illegitimate child because his parents could not have been married at the time of his birth; his mother was married to another man. The Court accepts this view for purposes of this motion.

(Ex. 3 to Govt.'s Dec. 5, 2012 Ltr. (Doc. No. 53-3) at 36.)  The import of Simpson's argument is

that Article 167 requires the Supreme Court to declare a law unconstitutional and Article 253 did

not operate to repeal the provisions of the Civil Code maintaining distinctions between children

born in and out of wedlock.  Because these statutes remained in force in 1974, were never

declared unconstitutional and were only recently repealed, Simpson urges the Court to find that

Panamanian law did not eliminate distinctions between children born in and out of wedlock for

purposes of legitimation under § 1432(a)(3).  The Court rejects Simpson's argument for two

reasons.  First, a declaration of unconstitutionality or explicit repeal of these statutes is not

required for purposes of § 1432(a)(3).  Second, Simpson's argument really cuts to a different

concern – the potential for the application of discriminatory laws contrary to the Constitution –

which, again, is not the focus of the § 1432(a)(3) analysis.

　　　To support his argument, Simpson provides the Court with analyses from two

Panamanian lawyers, Aura E. Guerra de Villalaz and Charlie Ezra Carrillo, about the meaning

and effect of what Simpson characterizes as a conflict between the Constitution and Civil Code.

First, Villalaz states:

> While it is true that the Constitution of 1946, established the principle of
> equality of all children before the law, without distinguishing whether
> born in or out of wedlock, at the level of the Civil Code the classification
> of legitimate children, [sic] recognized natural children and illegitimate
> children remained.  However, the principle of equality before the law for
> all children, without distinguishing between children born in or out of
> wedlock, was not legally recognized until the use of constitutional actions
> or claims before the Full Supreme Court of Justice was made, which is the
> Court that has centralized control in Constitutional matters.

(Ex. 4 to Def.'s Supp. Opp'n to Mot. in Limine (Doc. 49-4) at 1.)  Villalaz also opines,

"[A]lthough the Constitution of 1946 recognized . . . the right of equality of children before the

law, . . . the Civil Code maintained the validity of the difference between legitimate and

illegitimate children, until they were declared unconstitutional in various judgments of the Supreme Court of Justice." (*Id*. at 2.)

Simpson also provides a series of memos from Carillo. In them, Carillo echoes the principle that, pursuant to Article 167 of the Constitution, only the Supreme Court of Panama can declare a statute unconstitutional. As he writes, "only the Supreme Court of Panama could determine whether a law is contrary to the [C]onstitution and has exclusive authority to declare a law unconstitutional." (Ex. 1 to Def.'s Supp. Opp'n to Mot. in Limine (Doc. 49-1) at 3.) As such, "If [the] Supreme Court did not declare a specific article of [the] Civil Code of Panama as unconstitutional, it remained in effect and constituted a law."[10] (*Id*. at 4.)

Carillo also draws a more sweeping conclusion. He asserts that the tension between the Civil Code and the 1946 Constitution "led children born out of wedlock and later acknowledged to be treated inferior compared to legitimate children born in wedlock." (Ex. B to Def.'s Supp. Memo. in Opp'n (Doc. 43-2) at 3-4.) He opines:

> The lower courts of the Judicial Branch of Panama applied the Articles that were contrary to the Constitution in cases dealing with illegitimacy. The power to interpret the National Constitution is bestowed on the Supreme Court of Justice and Panama and is the only government body that can declare a statute unconstitutional.

(*Id*. at 5.) He concludes, therefore, that lower courts in Panama "had the discretion to apply" the provisions of the Civil Code maintaining distinctions between children born in and out of wedlock. (*Id*.)

---

[10] Similarly, when discussing the reforms brought about by the 1946 Constitution, Quintero notes that the 1946 Constitution "demanded a systematic and integral restructuring in the corresponding chapters of the Civil Code. But these have not undergone any reform. They continue, then, obeying a very different philosophy from the one that the Constitution endorses and they state writings that are contrary to those ordered by the Constitution." (Ex. D to Def.'s Nov. 21, 2012 Ltr. (Doc. No. 50-4) at 280.)

The lawyers point to a 1965 Supreme Court decision to show that only the Supreme Court could declare laws unconstitutional. Therein, the Court discussed the interplay between Articles 167 and 253 of the Constitution and emphasized its exclusive authority to declare laws unconstitutional. The Supreme Court noted that the 1946 Constitution "abolished" all laws that are contradictory to it, but nevertheless held that "it is not feasible/practicable to allow for the legal ability as to the criteria of any official as to whether this specific law contradicts the Constitution. . . ." (Ex. C to Def.'s Second Supp. Mem. in Opp'n (Doc. 50-3).) Permitting any government official to declare, or regard, a law as unconstitutional, in other words, would "create an obstacle to maintain adequate control" over declaring laws unconstitutional, an act "which is exclusively inherent to the Supreme Court of Justice under article 167 of the Constitution." (*Id*.) It is pursuant to this discussion that Simpson and his Panamanian experts conclude that the provisions of the Civil Code are still valid unless and until declared unconstitutional or repealed.

To be sure, as both lawyers recognize, the Supreme Court is the sole arbiter of the constitutionality of statutes. Neither the government nor the Court takes issue with this principle. But their opinions slightly miss the mark. What matters under § 1432(a)(3) is not a declaration of unconstitutionality from the Supreme Court. Instead, what matters is whether Panamanian law afforded different legal rights and obligations to children born out of wedlock than to those born in. In this regard, neither Carillo nor Villalaz challenges the supremacy of the 1946 Constitution or its fundamental pronouncement that all children in Panama, whether born in or out of wedlock, are equal. And most important, neither lawyer, nor Simpson himself, point to case law, statutes, or any examples of children born out of wedlock actually being afforded different legal rights than children born in wedlock pursuant to the Civil Code after the 1946 Constitution was enacted. Nor do they demonstrate in any way that the mere fact that these Civil

Code provisions remained "on the books" unless and until they were formally repealed or declared unconstitutional had any legal effect whatsoever on the status or equality of any Panamanian child, whether born out of wedlock or within a marital union.

To the contrary, the court cases upon which Simpson and his Panamanian legal experts rely uphold and underscore the constitutional mandate of equality, and strike down as unconstitutional the Civil Code provisions brought before it that in any way undermine the equal rights and obligations of illegitimate children. For example, a 1953 decision from the Panamanian Supreme Court declared unconstitutional various Civil Code provisions discriminating against children born out of wedlock in matters of intestate succession. The Court did so because these provisions violated "the literal writing as well as the spirit" of Articles 58 and 59 of the Constitution. (Ex. B to Def.'s Second Supp. Mem. in Opp'n (Doc. No. 50-2) at 1.) This same opinion noted that, in 1947, just a year after the Constitution went into effect, the Court struck down other provisions of the Civil Code on the same grounds: they violated the principle of equality embodied in Article 58. (*See id.*)

Similarly, the 1965 Supreme Court decision upon which each lawyer relies, in the Court's view, does not actually help Simpson, and instead, clearly underscores the full equality of children regardless of the circumstances of their birth. There, the Supreme Court declared unconstitutional Articles 164 to 170 of the Civil Code, which distinguished between children born in and out of wedlock.[11] Articles 164 to 170 dealt with legitimizing children. For example,

---

[11] Articles 160 to 174 comprise Title X of the Civil Code, entitled "Children Who Have Been Made Legitimate." (Ex. B. to Def.'s Dec. 14, 2013 Ltr. (Doc. No. 54-2).) Here, Simpson points to provisions in Title XIV of the Civil Code, entitled "On Illegitimate Children," as evidence that Panama did not abolish all distinctions between children born in and out of wedlock. (Ex. C to Def.'s Supp. Memo. in Opp'n (Doc. No. 43-3).) These two titles of the Civil Code thus defined the different rights and obligations of illegitimate children and illegitimate children who were later legitimated.

Article 164 stated that "only biological children can be legitimated." (Ex. B. to Def.'s Dec. 14, 2012 Ltr. (Doc. No. 54-2).) Article 167 provided that "children who have been legitimated shall enjoy the same rights as legitimate children." (*Id*.) Articles 165 and 166 explained when and how legitimization could occur. (*Id*.) The Supreme Court declared these articles unconstitutional because they impermissibly distinguished between natural and legitimate children by giving legitimated children the same rights as those born legitimate, and precluding natural children, *i.e.*, those who have not been legitimated, from the same set of rights. Thus, the statutes violated Articles 58 and 59 of the Constitution. (Ex. C to Def.'s Nov. 21, 2012 Ltr. (Doc. No. 50-3) at 1.)

The Court emphasized that its decision "cannot be any clearer" when Articles 58 and 59 of the Constitution declare

> "all children equal under the law . . ." and pronounces as abolished all "characterization/classification on the nature of the relationship." Likewise, it forbids/prohibits that the birth registration include any significant statement on the classification of the children.

(*Id*.) In discussing the "distinction between natural and legitimate children" in the provisions challenged, the Court added that "it is evident that they are a violation of the standard provisions included in articles 58 and 59 of the National Constitution, because it impacts the system of equality dependent on detailing the relationship." (*Id*.) The Supreme Court clearly declared Articles 164 through 170 unconstitutional, and its basis for doing so is equally clear: the Constitution mandates it.

Again, neither Carillo nor Villilaz contends that Articles 58 and 59 of the Constitution did *not* declare all children equal before the law. Indeed, as discussed above, there could be no clearer statement of equality, and the 1965 decision upon which their opinions are based

reinforces this view of the law.[12]  And as previously noted, Simpson points to no case that

demonstrates the *effect* of these remaining Civil Code provisions.  Indeed, cases to which he

points clearly demonstrate that, at every turn, the Supreme Court has declared unconstitutional

all Civil Code provisions which violate the Constitution's equality mandate.  That Article 167

vests in the Supreme Court the power to declare these laws unconstitutional does nothing to

change the fact that after 1946, all Panamanian children enjoyed the same rights and obligations

regardless of their status at birth, and so too their fathers vis-à-vis them upon proper

acknowledgement of paternity.[13]

---

[12] Even decades later, the Panamanian Supreme Court continues to reinforce the Constitution's equality mandate.  In a case decided by that court in 2002, the petitioner challenged the constitutionality of the use of "legitimate" and "natural children that might have been legally acknowledged" in Article 814 of the Civil Code, arguing that such distinctions were unconstitutional under Articles 58 and 59.  The Supreme Court agreed, finding it "unnecessary to make a distinction between legitimate and natural children legally acknowledged, *since both have the same rights*," as enshrined in the Constitution's equality provisions.  (Ex. E to Def.'s Supp. Opp'n (Doc. No. 43-5) at 14 (emphasis added).)  The Court continued, "we can attest that a large part of our judicial codes have eliminated the term 'legitimate children and natural children,' according to the equality that *exists since 1946* to all born to their progenitors." (*Id.* (emphasis added).)  The Supreme Court described the equality of children before the law as existing since 1946, when the Constitution at issue here was ratified.

[13] The Constitution's clear declaration of equality is what distinguishes this case from *In re Rowe*, 23 I. & N. Dec. 962 (BIA 2006) and *Matter of Hines*, 24 I. & N. Dec. 544 (BIA 2008).  In both cases, the BIA confronted seeming conflicts between two statutes, one which eliminated some distinctions between children born in and out of wedlock, and the other which maintained that the only means to legitimate a child is through marriage.  Whereas there may be some ambiguity in the statutes purporting to eliminate distinctions and prevent discrimination against children born out of wedlock – particularly when weighed against the competing statute clearly stating that the *only* means to legitimate a child is through the marriage of the parents – there is no such ambiguity in the Panamanian Constitution.  Moreover, the parties here concede the supremacy of the Panamanian Constitution.  Thus, if any ambiguity exists in the provisions of Panamanian law at issue here, it is in Articles 219, 224, and 226 of the Civil Code, upon which Simpson relies to argue that Panamanian law maintained distinctions between children born in and out of wedlock.  These statutes describe the different rights accorded to children based on their birth status, but contain no unequivocal or explicit declaration like the Panamanian Constitution does, or like the statutes in *Rowe* and *Hines* did in stating that the only means to legitimate a child is by the marriage of the parents.  Moreover, it is unclear whether *Rowe* and

In his own opinion, Carillo readily discusses the true impact of Article 167, and contradicts his own argument by suggesting that any lower court or civil employee would not be able to enforce a Civil Code provision in conflict with the Constitution without first bringing that conflict to the attention of the Supreme Court. Though he suggests, without any support, that lower courts have the discretion to apply the offending Civil Code provisions, he plainly states that Article 167 of the Constitution

> expressly required all civil employees responsible for administering justice, to consult the Supreme Court when they considered a legal disposition as unconstitutional *for the Court to resolve the issue before applying the legal disposition to a case.* In other words, if a judge considered a legal disposition as unconstitutional *he or she had to consult with the Supreme Court before applying the law to a specific case.*

(Ex. 1 to Def.'s Supp. Opp'n to Mot. in Limine (Doc. No. 49-1) at 4) (emphasis added). The plain import of Carillo's own discussion of Article 167 suggests that the lower courts could not enforce a provision of the Civil Code that conflicts with the Constitution. In fact, it is through this very mechanism that the Supreme Court, in the cases cited by Simpson's legal experts, has held unconstitutional Civil Code provisions that maintained distinctions between legitimate and illegitimate children. Thus, Carillo's conclusion that the tension between the remaining Civil Code provisions and the 1946 Constitution "led children born out of wedlock and later acknowledged to be treated inferior compared to legitimate children born in wedlock" is belied both by his own analysis and the Supreme Court's unwavering endorsement of the equality of all Panamanian children.

In actuality, Carrillo's conclusion goes to a different concern that, as mentioned above, does not come into the § 1432(a)(3) analysis. Carrillo and Simpson both are concerned that the

---

*Hines* are good law in this circuit after the Second Circuit's decision in *Watson.* And even if they are, they are distinguishable.

offending Civil Code provisions could lead to unequal treatment of children born out of wedlock. As Simpson noted, "Given the stigma attached to natural and illegitimate children and their mothers, it is unclear whether [these provisions] remained unchallenged because they were not applied or enforced by the local courts, or because the individuals they affected were too poor or uneducated to challenge their application." (Def.'s Nov. 30, 2012 Ltr. (Doc. No. 52) at 4.) However, Simpson candidly acknowledges the weakness in his argument and that he is "unable to address . . . whether the use of the words legitimate, natural, and illegitimate in the Civil Code was an anachronism that was ignored in light of the Constitution, or whether there was substantive discrimination against natural and illegitimate children." (*Id*. at 5.) Given these uncertainties, he claims that the *potential* for discrimination against children born of unwed parents, born of the fact that these laws were still "on the books," satisfies § 1432(a)(3)'s requirement that he not be considered a legitimate child under the laws of Panama.

On the surface, his argument is attractive. But the Court cannot rest its decision upon it because § 1432(a)(3) is not concerned with the *potential* that discriminatory, anachronistic laws, which were clearly contradictory to the Constitution, would be improperly enforced or applied, or were not declared unconstitutional. That is because, as discussed above, legitimacy under § 1432(a)(3) is "a legal condition." *Lau*, 562 F.2d at 549. The law makes Simpson legitimate or illegitimate by conferring on all children equal rights and obligations irrespective of their status at birth. And Simpson does not dispute that Articles 58 and 59 of the Constitution *were* the law in 1974. Articles 58 and 59 "cannot be any clearer" as the Supreme Court has held: they unequivocally declare that "all children are equal before the law," abolishing "any classification based on the nature of the relationship." Simply put, the Constitution *is* the law. This Court need not wait for the Panamanian Supreme Court to formally declare the provisions of the Civil

Code upon which Simpson rely unconstitutional, as any such declaration would not change the "legal condition" of equality set forth in the Constitution, and thus would have no effect on whether Simpson is "legitimate" under § 1432(a)(3).

We have spent considerable effort meandering through the thicket of Panamanian law after promulgation of the 1946 Constitution. But we cannot lose sight of what brought us on that journey: our own United States statute, § 1432(a), and its goal of ensuring that the rights of an absent alien father are not extinguished by granting derivative citizenship to his child through the unilateral naturalization of the mother. The statute confers derivative citizenship, but only where "paternity has not been established by legitimation." That is, where the law of the child's birthplace has abolished all distinctions between the rights and obligations of children whether born in or out of wedlock, and the father has established his paternity, § 1432(a) will not divest that absent father of any right or obligation he may have vis-à-vis his child, including any right he may have in determining that child's citizenship.

By any measure, Panama has clearly and unequivocally abolished all distinctions in the rights and obligations of fathers toward their children, no matter if that child is born of a legal marital union or out of wedlock. It has done so through its 1946 Constitution and in the clear pronouncements of its Supreme Court since. Through Article 58, it has forcefully declared the equality of all children. Through Article 59, it has abolished all classifications and labels distinguishing between legitimate and illegitimate children, not only going forward, but retroactively. Through Article 253, it has declared unconstitutional all laws that run contrary to these constitutional mandates. Through its authority pursuant to Article 167, the Supreme Court has consistently struck down all laws that could be used to discriminate based on unconstitutional classifications regarding a child's status at birth. Panama's Attorney General

agreed with this reading of his nation's laws, and so too does the BIA. Simpson has provided no case or example to the contrary, and merely relies on the potential for unlawful discriminatory enforcement of laws that, in any event, the Panamanian Constitution and Supreme Court would clearly regard as unconstitutional.

Simply put, the Court finds no other way to reconcile the import of the Constitution's equality provisions and the case law construing it, which placed Simpson "in the same legal position as a child born in wedlock." *In re Moraga*, 23 I. & N. Dec. at 197. They accorded him "equal treatment under the laws." *In re Rowe*, 23 I. & N. Dec. at 965-66. These provisions "make all children born in [Panama] 'legitimate.'" *Lau*, 563 F.2d at 550.

As such, Simpson does not satisfy the third requirement of § 1432(a) that his paternity not be established by legitimation. Simpson's father acknowledged that he was indeed the father when he signed the birth certificate before the Civil Registry. Panamanian law thus afforded Simpson the same legal rights and obligations as it afforded a child born in wedlock. Therefore, as a matter of law, Simpson did not derive citizenship from his mother upon her naturalization.

Accordingly, the Court GRANTS the government's motion and will preclude Simpson from presenting evidence of any derivative-citizenship defense to the jury.

## II.    Evidence of INS positions

Simpson also moves to introduce at trial evidence that, on at least two occasions, INS officials allegedly agreed with Simpson that he derived citizenship from his mother. The government asks the Court to preclude Simpson from introducing such evidence. It argues that preclusion rules bar the defendant from introducing this evidence because, in rejecting his motion to dismiss the indictment, the Court ruled that prior INS' positions were not binding on the government. The government also argues that the positions are irrelevant under Federal Rule

of Evidence 401. Simpson counters that, although the Court found that the positions were not binding on the government, they are still admissible as relevant to his defense of derivative citizenship and not excluded by the hearsay rule. Rule 801(d)(2)(B) permits introducing them as an opposing-party admission that the party adopted or believed to be true, and Rule 803(8) permits introducing them as a public record.

Simpson's argument fails, as the Court has ruled, as a matter of law, that Simpson did not derive citizenship from his mother upon her naturalization. The INS' positions are thus irrelevant as they have no "tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401(a).

Simpson also contends that the statements are admissible impeachment material. When the government presents its evidence of Simpson's alienage, Simpson could arguably impeach that evidence with the INS's positions. *See* Fed. R. Evid. 608(b). But the probative value of the impeachment evidence is substantially outweighed by the danger of confusing the issues and misleading the jury. *See* Fed. R. Evid. 403. Given the Court's ruling on Simpson's defense as a matter of law, the jury cannot decide that Simpson is, in fact, not an alien based on any claim to derivative citizenship. Evidence of the INS's positions would confuse the jury and potentially mislead them to concluding that Simpson may have some claim to derivative citizenship.

Therefore, the Court GRANTS the government's motion and will preclude Simpson from presenting any evidence regarding the INS' positions as to Simpson's citizenship status. The Court need not reach the government's argument based on preclusion.

### III.    Cross-Motion on Prior Convictions

During the course of briefing the government's motion, Simpson cross-moved to preclude the government from introducing testimony regarding Simpson's prior convictions for

an aggravated felony. He also requests that, if the indictment is introduced into evidence or otherwise used at trial, the phrase "after conviction for the commission of an aggravated felony" be redacted from it. The government agrees to redact the language in the indictment as Simpson requested. However, the government argues that it should be permitted to elicit testimony at trial that Simpson was removed from the United States following the commission of a crime so as to present a coherent narrative of the events leading to his being charged with illegal reentry. The Court agrees with Simpson.

In order to prove the crime of illegal reentry following deportation, the government must establish beyond a reasonable doubt, among other things, that, prior to the time of the offense alleged in the indictment, the defendant had been deported from the United States. *See United States v. Macebo-Santiago*, 875 F. Supp. 1030, 1032 (S.D.N.Y. 1995) (listing the elements of a § 1326 offense). Section 1326(a) does not require the government to prove the reasons for the defendant's deportation, such as having been convicted of an aggravated felony. As such, the Court is not convinced that the reasons for Simpson's deportation are relevant. *See* Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."). The reasons for Simpson's deportation do not make the fact of whether he was deported more or less probable; the reasons for his deportation are also not "of consequence" to the crime charged because § 1326 requires no proof thereof.

Nevertheless, the government urges that the evidence of his prior convictions should be admitted so that it can present a coherent narrative of the crime. Uncharged criminal activity may be admissible "'if it is necessary to complete the story of the crime [on] trial.'" *United States v. Towne*, 870 F.2d 880, 886 (2d Cir. 1989) (quoting *United States v. Weeks*, 716 F.2d

830, 832 (11th Cir. 1983)) (brackets in original).  As explained above, however, the reasons for

Simpson's deportation are not *necessary* to completing the story of the crime with which he is

charged:  illegal reentry.  Nor are Simpson's prior convictions part of "'the same transaction or

series of transactions as the charged offense,'" nor "'inextricably intertwined with the evidence

regarding the charged offense.'"  *Towne*, 870 F.2d at 886 (quoting *Weeks*, 716 F.2d at 832).

Moreover, the prior convictions are inadmissible under Rule 404(b) of the Federal Rules of

Evidence because they do not prove "motive, opportunity, intent, preparation, plan, knowledge,

identity, absence of mistake, or lack of accident."

Even if his prior convictions were admissible for any of the reasons the government

urges, the Court would still exclude their admission under Rule 403 because their limited

probative value is substantially outweighed by the danger of unfair prejudice to Simpson.  *See*

Fed. R. Evid. 403.  As such, the Court GRANTS Simpson's motion to exclude testimony

regarding the reasons for his deportation, namely, his prior convictions.  Moreover, at trial, the

Court will require the government to redact the phrase "after conviction for the commission of an

aggravated felony" from the indictment should it be introduced into evidence.

## CONCLUSION

For the foregoing reasons, the government's motion *in limine* to preclude Simpson from presenting evidence to show that he derived citizenship from his mother is GRANTED. The government's motion to preclude Simpson from presenting evidence of the INS's positions as to his citizenship status is also GRANTED.

Simpson's motion to preclude the government from presenting evidence of his prior criminal convictions is also GRANTED. Should the government or defendant wish to introduce into evidence the indictment, the phrase "after conviction for the commission of an aggravated felony" must be redacted.

SO ORDERED.

Dated: Brooklyn, New York
      March 8, 2013

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
United States District Judge